*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HIGHFIELD BEACH AT LAKE MICHIGAN,

Plaintiff-
Counterdefendant/Appellee,

v

SCOTT E. SANDERSON,

Defendant-Counterplaintiff-Third-
Party Plaintiff/Appellant,

and

MARK CODDINGTON, CHRIS BARCZYK,
PAUL SWANSTROM, and BLAKE HARDIN,

Third-Party Defendants/Appellees.

FOR PUBLICATION
March 24, 2020
9:00 a.m.

Nos. 343968; 345177
Allegan Circuit Court
LC No. 17-057606-CH

Before: GADOLA, P.J., and MARKEY and RONAYNE KRAUSE, JJ.

MARKEY, J.

This case concerns the enforceability of an amended condominium bylaw prohibiting short-term rentals where such rentals had been expressly contemplated and allowed under an existing 15-year contract between the owner of a condominium unit and a property management company. The bylaw in effect when the contract was executed had permitted short-term rentals of 14 days or more, and the contract essentially incorporated the bylaw, authorizing the property management company to lease the condominium unit for periods as short as 14 days. The amended bylaw required a minimum rental term of four months, effectively precluding the property management company from leasing the unit to typical vacationers. Resolution of these consolidated appeals requires construction of the Condominium Act, MCL 559.101 *et seq.* In Docket No. 343968, appellant Scott E. Sanderson, owner of the condominium unit, appeals by right the trial court's orders granting summary disposition in favor of appellees Highfield Beach at Lake Michigan (HBLM), Mark Coddington, Chris Barczyk, Paul Swanstrom, and Blake

-1-

Hardin.[1]  We hold that the amended bylaw is enforceable in regard to the property as urged by HBLM in its complaint for declaratory and injunctive relief and that Sanderson's counterclaim and third-party complaint for money damages based on lost rental income fail as a matter of law. Accordingly, we affirm the orders granting appellees' motions for summary disposition in Docket No. 343968.  In Docket No. 345177, Sanderson appeals by right the trial court's order awarding attorney fees and costs to HBLM.  We hold that HBLM was entitled to an award of attorney fees and costs.  Accordingly, we affirm the trial court's order awarding attorney fees and costs to HBLM in Docket No. 345177.

## I.  FACTUAL AND PROCEDURAL HISTORY

HBLM is a Michigan nonprofit corporation that serves as the owners association of a site condominium project in South Haven that was established in 2007.  The master deed and the condominium bylaws affiliated with the development were recorded in the office of the Allegan County Register of Deeds.  Pertinent to this case, Article VII, § 3(a), of the bylaws had originally provided that "[n]o Co-Owner shall lease his unit for a term less than fourteen (14) days nor shall any Co-Owner lease or rent less than an entire unit in the condominium."[2]  Subsection 3(a) further indicated that the requirement of a minimum 14-day rental period also applied "to a Co-Owner who places his unit on rental management[.]"

In 2008, HBLM attempted to amend the bylaws to increase the minimum rental term from 14 to 90 days.  The record is fairly limited and vague regarding what transpired after the attempt. There is documentation and an affidavit indicating that condominium co-owners in the development unanimously consented to the modification but that a mortgagee, Macatawa Bank, never approved the amendment.  Sanderson claimed that evidence existed showing that the amendment had been fully approved and that HBLM should have recorded the amendment and placed it in its files.  There is no dispute that the purported 2008 amendment was never recorded, and HBLM documents reflected a belief that a valid or operative amendment never came to fruition.  This issue will be explored in more detail later in this opinion.

In December 2013, Sanderson purchased a condominium unit in the development. Sanderson then constructed a 5,600 square-foot, single-family home on the property.  In his deposition, Sanderson agreed that he had reviewed the master deed and the bylaws before buying the property; however, he did not speak to any board members before the purchase.

---

[1] We shall refer to the individual appellees as "the HBLM Board Members" or simply "the Board Members."

[2] A "co-owner" is statutorily defined as "a person, firm, corporation, partnership, association, trust, or other legal entity or any combination of those entities, who owns a condominium unit within the condominium project."  MCL 559.106(1).  A "condominium unit" consists of "that portion of the condominium project designed and intended for separate ownership and use, as described in the master deed, regardless of whether it is intended for residential, office, industrial, business, recreational, use as a time-share unit, or any other type of use."  MCL 559.104(3).

On June 23, 2015, after having constructed the home on the property, Sanderson signed a 15-year contract with CRA Management, LLC, authorizing CRA to manage the property in relation to future rentals. The CRA contract was labeled a "Lease Agreement," and it did provide that Sanderson was leasing his condominium unit to CRA for the 15-year period. But the CRA contract also had language characterizing the contract as a rental or property management agreement. CRA agreed to pay Sanderson a minimum of $96,000 per year under a formula that applied certain percentages to the "gross rental proceeds" that CRA collected from renters. The CRA contract further provided:[3]

> The nature of this Lease Agreement is to provide for rental management upon terms and conditions that satisfy Owner[']s needs for lease revenue for the duration of the Owner's mortgage obligations while limiting the scope of the Company's leasing activities to comply fully with all requirements of Article VII, Section 3 of the Master Deed, the provisions of the Michigan Condominium Act and the laws and ordinances of Casco Township, as follows:

> * * *

> c. Company may not lease the Property for less than Fourteen (14) day terms . . . . This provision means that Company may only lease the Property once in any Fourteen (14) day period. In the event the tenant elects not to occupy the Property for the entire term, the Property may be used in such vacated periods only for the personal use of the Owner, whether for recreational use, maintenance, decorating, or such purposes as Owner chooses. During such vacated periods, the Property may not be occupied by any individual(s) unless Owner or a member of owner's family is in residence at such times.

> d. Company shall require tenants to comply fully with all use restrictions set forth in Article VII, Section 3, as attached as Exhibit A. Company shall take reasonable steps to inform tenants of such requirements and agrees to enforce compliance in a commercially reasonable manner.

After executing the CRA contract, Sanderson e-mailed the document to HBLM for review and approval. Sanderson claimed that HBLM approved the CRA contract. HBLM, however, supplied an affidavit by Board Member Barczyk that reflected the contrary. Barczyk averred that "[t]he Board did not vote to approve the management agreement between Sanderson and CRA . . ., and there is otherwise no record of a decision by the Board to approve the agreement." Sanderson asserted that as rental agreements were signed with vacationing tenants under the CRA contract, copies of the leases were sent to HBLM for review. HBLM indicated that it approved conforming leases that were submitted by or on behalf of Sanderson.

In June 2016, HBLM began the process of amending the bylaws to prohibit short-term rentals. Sanderson voiced an objection to the proposed amendment to the board and co-owners and claimed that it would not apply to his existing contract with CRA and that Board Member

---

[3] In the contract, "Owner" refers to Sanderson, and the "Company" is a reference to CRA.

Barczyk, who owned nearly half the lots in the development, would not be subject to the rental restriction because he held the status of "successor developer." Barczyk denied that he held any special status that would entitle him to avoid the short-term rental prohibition; he insisted that he would abide by the amendment. HBLM obtained a legal opinion that Barczyk would indeed be bound by a bar on short-term rentals.[4]

Upon obtaining the consent of two-thirds of the co-owners and mortgagees, HBLM amended Article VII, § 3(a), of the bylaws in November 2016 to now prohibit co-owners from leasing their condominium units for terms of less than four months. Specifically, the language of Article VII, § 3(a), as amended, provided in relevant part as follows:

> No Co-Owner shall lease his unit for a term of less than four consecutive months, and any such lease for said minimum lease term shall be to the same lessee. Nor shall any Co-Owner lease or rent less than an entire unit in the condominium. The provisions of this Section shall also apply to a Co-Owner who places his Unit under rental management; in which case, the rental management agreement shall also be approved in addition to each lease. It shall be each Co-Owner's responsibility to ensure that each tenant or occupant of his unit abides by all provisions of the Condominium Documents.

Thereafter, Sanderson, through counsel, sent HBLM a letter asserting that the amendment did not apply to Sanderson because HBLM could not legally invalidate an existing lease agreement such as the one that he had signed with CRA. In support of his stance, Sanderson cited MCL 559.212(1), which provides:

> Before the transitional control date, during the development and sales period the rights of a co-owner, including the developer, to rent any number of condominium units shall be controlled by the provisions of the condominium documents as recorded by the developer and shall not be changed without developer approval. After the transitional control date, the association of co-owners may amend the condominium documents as to the rental of condominium units or terms of occupancy. *The amendment shall not affect the rights of any lessors or lessees under a written lease otherwise in compliance with this section and executed before the effective date of the amendment*, or condominium units that are owned or leased by the developer. [Emphasis added.]

Sanderson maintained that pursuant to MCL 559.212(1), the 2016 amendment could not infringe on his rights or CRA's rights to continue short-term rentals under the CRA contract because the contract was executed before the amendment took effect.

After Sanderson and CRA forged ahead with short-term rentals in defiance of the amended bylaw, HBLM commenced the instant lawsuit in January 2017 requesting declaratory and injunctive relief. HBLM alleged that Sanderson's condominium unit was subject to the four-

---

[4] The parties disputed below and still dispute on appeal whether HBLM obtained the legal opinion before or after the amendment was voted on and approved.

month lease requirement regardless of the CRA contract. HBLM contended that the contract constituted a property management agreement and not a lease agreement. Thus, according to HBLM, MCL 559.212(1) did not exclude Sanderson's unit from application of the 2016 amendment barring short-term leases. Sanderson filed an answer challenging HBLM's position, and he set forth numerous affirmative defenses, including waiver, acquiescence, estoppel, unclean hands, and laches.

Sanderson also filed a counterclaim against HBLM and a third-party complaint against the HBLM Board Members.[5] Sanderson alleged a counterclaim of breach of contract against HBLM and a third-party claim of breach of contract against the Board Members. MCL 559.168 provides that "[a]n association of co-owners shall keep current copies of . . . all amendments to the master deed . . . available at reasonable hours to . . . prospective purchasers . . . of condominium units[.]" Similarly, Article I, § 7, of the bylaws stated that HBLM "shall maintain on file current copies of . . . any amendments" to the master deed "and shall permit all . . . prospective purchasers . . . in the Project[] to inspect the same during reasonable hours." And MCL 559.173 provides that "[a] master deed and an amendment to the master deed shall be recorded." Relying on these provisions, Sanderson asserted that HBLM and the Board Members had a contractual and statutory obligation to maintain on file and to record the proposed 2008 amendment, that they failed to do so, and that had HBLM and the Board Members complied with their duties, Sanderson would have had notice that short-term rentals were disfavored and proceeded differently. Sanderson contended that the breach of contract caused damages consisting of the loss of rental income exceeding $1 million.

Sanderson next alleged a third-party claim of negligence against the Board Members. Sanderson maintained that the Board Members were negligent for failing to educate themselves about the scope of the 2016 amendment, for "misleading" their fellow co-owners regarding the scope, benefits, limitations, and risks inherent in adopting the 2016 amendment, and for neglecting to ensure that the 2008 unrecorded amendment was recorded. Much of Sanderson's focus was on his insistence that Board Member Barczyk did not have to abide by the short-term rental prohibition and on the refusal of the Board Members to accept that truth. Sanderson claimed that the Board Members' negligent conduct caused damages consisting of the loss of rental income exceeding $1 million.

Finally, Sanderson alleged a third-party claim of breach of fiduciary duty against the Board Members. Sanderson asserted that the Board Members breached their fiduciary duties in the same manner that they committed negligence and by failing to provide a meaningful opportunity for the co-owners to consider and debate the 2016 amendment. Sanderson contended that the breach of fiduciary duties caused damages consisting of the loss of rental income exceeding $1 million.

In July 2017, HBLM filed a motion for summary disposition pursuant to MCR 2.116(C)(10) on its complaint for declaratory and injunctive relief. The parties presented their competing interpretations of MCL 559.212(1) and the CRA contract. In August 2017, the trial court issued a written opinion and order granting HBLM's motion pursuant to MCR 2.116(C)(10). The trial court ruled that MCL 559.212(1) "is aimed at protecting the vested rights of parties to a

_____

[5] The counterclaim and third-party complaint were consolidated in a single document filed by Sanderson.

-5-

binding lease agreement that was executed prior to any relevant bylaw amendment[,]" which "agreement affords the tenant with certain ownership and possessory rights." The court determined that the CRA contract was not a lease agreement covered by MCL 559.212(1). The trial court reached that conclusion because CRA obtained no ownership or possessory interest in Sanderson's condominium unit under the contract. The court further reasoned that the CRA contract constituted a property management agreement, simply giving "CRA the right to secure tenants for . . . short-term vacation rentals and [to] manage the tenant's enjoyment of same." The trial court agreed with HBLM's assertion that the 2016 amendment applied to rental agreements entered into by CRA after the amended bylaw took effect despite the fact that the leases were procured under the authority of the CRA contract that had been executed prior to the amendment.

In October 2017, HBLM and the Board Members moved for summary disposition pursuant to MCR 2.116(C)(10) with respect to Sanderson's counterclaim and third-party complaint. In May 2018, the trial court issued a written opinion and order granting summary disposition in favor of HBLM and the Board Members.[6] The trial court addressed each of Sanderson's claims and ruled that there was no genuine issue of material fact that the claims were unsustainable as a matter of law.

In regard to the breach of contract claim, the trial court found that it was undisputed that the alleged 2008 amendment was not recorded; therefore, the amendment was inoperative under MCL 559.153. Moreover, the court concluded that the Board Members were not even on the board in 2008. Consequently, they had no contractual duty to record the amendment even if it was valid. The trial court also determined that HBLM did not have a contractual obligation to "record an amendment that is not properly adopted." The court observed that there was no evidence that the mortgagee, Macatawa Bank, had approved the amendment and that there was no legal authority to support the proposition that HBLM was required to record an instrument that was not fully approved. The trial court explained that without proof of the mortgagee's approval, Sanderson could not establish any contractual duty or breach.

The trial court next rejected Sanderson's negligence claim. The court determined that there was no legal authority or evidence supporting a negligence theory based on a failure of the Board Members "to educate themselves about the scope" of the 2016 amendment. Additionally, the trial court stated that, as revealed in their affidavits, the Board Members had educated themselves regarding the 2016 amendment through the assistance and advice of legal counsel. With respect to Sanderson's claim that the Board Members misled fellow co-owners regarding the effect of the new lease restrictions on Board Member Barczyk, the court found that there was nothing improper or negligent about the Board Members relying on legal advice that Barczyk would be bound by the 2016 amendment and conveying that information to co-owners. This was true even though Sanderson's attorney had informed the Board Members to the contrary. The trial court noted that there was no testimony or affidavit from any co-owner about feeling misled and that Sanderson failed to produce any documentary evidence indicating that co-owners were misled. To the extent that the negligence claim concerned the purported 2008 amendment, the trial court repeated the

---

[6] The trial court judge who issued the ruling with respect to the earlier motion for summary disposition retired, with his replacement issuing the second written opinion and order.

findings that it made in relation to the amendment and the breach of contract claim. Moreover, according to the trial court, Sanderson was aware of the fact that HBLM could amend the bylaws at any time.

Finally, the trial court ruled that Sanderson's claim of breach of fiduciary duty also failed as a matter of law, concluding that the Board Members had no duty to "educate themselves," that there was no evidence that they misled co-owners, and that they properly relied on the opinion of counsel that Barczyk and his 24 lots would be bound by the 2016 amendment. The court's reasoning mimicked its discussion of the negligence claim. The trial court also found that the Board Members did not breach a fiduciary duty for allegedly failing to provide a meaningful opportunity for debate and to be heard before the 2016 amendment was finalized. The court determined that there was no evidence that the Board Members violated the master deed or the bylaws in approving the 2016 amendment and that there was no statutory provision mandating a "meaningful opportunity" for debate or to be heard. Lastly, the trial court stated that there was no evidence or law to support the view that the Board Members breached a fiduciary duty by failing to record the inoperative 2008 amendment.

In sum, the trial court granted summary disposition in favor of HBLM and the Board Members, dismissing Sanderson's counterclaim and third-party complaint. The court enjoined Sanderson "and his agents from continuing to lease his unit in violation of [the] bylaws." In Docket No. 343968, Sanderson appeals the trial court's summary disposition orders by right.

Subsequently, HBLM filed a motion for attorney fees and costs, arguing that fees and costs were authorized by MCL 559.206(b) and Article XII of the bylaws. HBLM maintained that Sanderson's refusal to comply with the bylaws required him to pay the attorney fees and costs incurred by HBLM in enforcing the bylaws through the litigation. HBLM requested $52,295 in attorney fees and expenses and attached supporting documentation. The trial court granted HBLM's motion for attorney fees and costs. The court found that an award was proper, rejecting a variety of arguments posed by Sanderson against the award, including his assertion that HBLM failed to plead a contract claim in support of attorney fees and costs. The trial court determined that the amount requested by HBLM was reasonable, except that the court reduced the amount by 10 percent because the fees had improperly included representation of the Board Members. In July 2018, the trial court entered an order awarding HBLM $44,360 in attorney fees and costs. In Docket No. 345177, Sanderson appeals by right the trial court's order awarding HBLM attorney fees and costs. This Court consolidated the two appeals. *Highfield Beach at Lake Mich v Sanderson*, unpublished order of the Court of Appeals, entered September 4, 2018 (Docket Nos. 343968 and 345177).

## II. ANALYSIS

### A. STANDARDS OF REVIEW AND GENERAL GUIDING PRINCIPLES

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). A motion brought pursuant to MCR 2.116(C)(10) tests the factual sufficiency of a claim. *El-Khalil v Oakwood Healthcare, Inc*, __ Mich __, __; __ NW2d __ (2019); slip op at 7. "When considering such a motion, a trial court must consider all evidence submitted by the parties in

-7-

the light most favorable to the party opposing the motion." *Id.* A court may only grant the motion when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10); see also *El-Khalil*, __ Mich at __; slip op at 7. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). For purposes of MCR 2.116(C)(10), a trial court is not allowed to weigh the evidence, assess credibility, or resolve factual disputes. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). "A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10)." *Id.*

"Condominium bylaws are interpreted according to the rules governing the interpretation of a contract." *Tuscany Grove Ass'n v Peraino*, 311 Mich App 389, 393; 875 NW2d 234 (2015). And we review de novo the interpretation and application of contracts. *In re Rudell Estate*, 286 Mich App 391, 402-403; 780 NW2d 884 (2009). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties[;] [t]o this rule all others are subordinate." *McIntosh v Groomes*, 227 Mich 215, 218; 198 NW 954 (1924). "In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005). "[U]nless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." *Id.* at 461. If the language of a contract is ambiguous, testimony may be taken to explain the ambiguity. *New Amsterdam Cas Co v Sokolowski*, 374 Mich 340, 342; 132 NW2d 66 (1965); see also *Frankenmuth Mut Ins Co v Masters,* 460 Mich 105, 111; 595 NW2d 832 (1999).

This Court reviews de novo issues of statutory construction. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008). In *Wayne Co v AFSCME Local 3317*, 325 Mich App 614, 633-634; 928 NW2d 709 (2018), this Court explained the rules of statutory interpretation:

> The primary task in construing a statute is to discern and give effect to the Legislature's intent, and in doing so, we start with an examination of the language of the statute, which constitutes the most reliable evidence of legislative intent. When the language of a statutory provision is unambiguous, we must conclude that the Legislature intended the meaning that was clearly expressed, requiring enforcement of the statute as written, without any additional judicial construction. Only when an ambiguity in a statute exists may a court go beyond the statute's words to ascertain legislative intent. We must give effect to every word, phrase, and clause in a statute, avoiding a construction that would render any part of the statute nugatory or surplusage. [Citations omitted.]

"We review for an abuse of discretion a trial court's award of attorney fees and costs." *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id*. Findings of fact related to an award of attorney fees are reviewed for clear error, and questions of law pertaining to an award are reviewed de novo. *Brown v Home-Owners Ins Co*, 298 Mich App 678, 689-690; 828 NW2d 400 (2012).

## B. CONDOMINIUM ACT OVERVIEW

In pertinent part, MCL 559.153 provides that "[t]he administration of a condominium project shall be governed by bylaws recorded as part of the master deed, or as provided in the master deed." "Bylaws are attached to the master deed and, along with the other condominium documents, the bylaws dictate the rights and obligations of a co-owner in the condominium." *Tuscany Grove*, 311 Mich App at 393. The Condominium Act defines "condominium documents" as "the master deed . . . and any other instrument referred to in the master deed or bylaws which affects the rights and obligations of a co-owner in the condominium." MCL 559.103(10). MCL 559.206(a) provides that "[f]ailure to comply with any of the terms or provisions of the condominium documents, shall be grounds for relief, which may include without limitations, an action to recover sums due for damages, injunctive relief, foreclosure of lien if default in payment of assessment, or any combination thereof."

## C. DISCUSSION AND RESOLUTION – SUMMARY DISPOSITION AND HBLM'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

In general, "the master deed, bylaws, and condominium subdivision plan may be amended, even if the amendment will materially alter or change the rights of the co-owners or mortgagees, with the consent of not less than 2/3 of the votes of the co-owners and mortgagees." MCL 559.190(2). But MCL 559.190(2) is tempered by MCL 559.212(1), which provides, as noted earlier, that while a condominium association may amend condominium documents as to the rental of condominium units or occupancy terms, "[t]he amendment shall not affect the rights of any lessors or lessees under a written lease otherwise in compliance with this section and executed before the effective date of the amendment[.]"[7]

The crux of Sanderson's argument is that pursuant to MCL 559.212(1), he and CRA, as lessor and lessee respectively, had "rights" under the written lease, i.e., the CRA contract, that included participating in future rentals or leases of the condominium unit for terms as short as 14 days, which rights could not be affected or imperiled by the subsequent amendment of the pertinent bylaw. There was an expectation by Sanderson that the 15-year CRA contract, which obligated CRA to pay Sanderson at least $96,000 per year, would allow CRA to lease the condominium unit to persons for minimum rental periods of 14 days.

We hold that the CRA contract constituted a property management agreement, not a lease agreement; therefore, the exception to the general enforceability of bylaw amendments found in MCL 559.212(1) was not implicated in this case. The term "lease," as used in MCL 559.212(1), is not defined in the Condominium Act. Black's Law Dictionary (7th ed) defines a "lease" as "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration, usu. rent." See *People v Flick*, 487 Mich 1, 11-12; 790 NW2d 295 (2010) (utilizing legal dictionary to define term that has a unique legal meaning but is undefined in the statute being construed). Our Supreme Court has observed that "[a] lease is defined to be a contract for the possession . . . of lands and tenements on the one side, and

---

[7] Bylaws may contain "restrictions on the sale, *lease*, license to use, or occupancy of condominium units." MCL 559.156(b) (emphasis added).

a recompense of rent or other income on the other." *Miles v Shreve*, 179 Mich 671, 676; 146 NW 374 (1914) (quotation marks omitted); see also *Flick*, 487 Mich at 11 (when words adopted in a statute have a settled, definite, and well-known meaning, we assume that they are used with the meaning that they had at common law absent a contrary intent plainly shown). A "lessor" is "[o]ne who conveys real or personal property by lease[,]" and a "lessee" is "[o]ne who has a possessory interest in real or personal property under a lease." *Black's Law Dictionary* (7th ed).

In closely examining the language of the CRA contract, it becomes clear that CRA had no actual right to possess, occupy, or use the condominium unit. Although it had the authority granted by Sanderson to rent the unit to others, CRA itself had no possessory interest. During periods of vacancy, Sanderson retained the right to possess and occupy the premises. The property was either to be possessed by a tenant or by Sanderson under the contract. And the CRA contract required the unit to "be decorated, furnished, and maintained" by Sanderson, not CRA, so CRA had no on-site presence for upkeep. CRA's exclusive role under the plain and unambiguous language of the contract entailed marketing, financial management, and oversight. Indeed, the contract specified that CRA "is in the rental management business." Regardless of the nomenclature used in the CRA contract, the contract was not a "lease" and CRA was not a "lessee."

At the time that the CRA contract was executed, Article VII, § 3(a), of the bylaws had provided that the requirement of a minimum 14-day rental period also applied "to a Co-Owner who places his unit on rental management; in which case, the rental management agreement shall be approved *as if a lease* in accordance with this Article." (Emphasis added.) Sanderson seizes on the emphasized language, arguing that HBLM chose to treat property management agreements as leases and thus the exception in MCL 559.212(1) was implicated. This argument lacks merit. Article VII, § 3(a), of the bylaws required the submission of leases to HBLM for "written approval . . . prior to renting" a condominium unit. The language in Article VII, § 3(a), that Sanderson relies upon simply indicated, clumsily so, that a property management agreement, like a lease, had to be submitted to and approved by HBLM. The language was not intended to and did not convert or transform property management agreements into leases. With the 2016 amendment, Article VII, § 3(a), of the bylaws was modified to state, "The provisions of this Section shall also apply to a Co-Owner who places his Unit under rental management; in which case, the rental management agreement shall also be approved *in addition to each lease*." (Emphasis added.) In our view, this language merely clarified the awkward drafting of the prior provision, making clear that property management agreements had to be submitted to and approved by HBLM. We reject Sanderson's contention that the change in language from "as if a lease" to "in addition to each lease" established that the earlier modified language meant that property management agreements and leases were effectively one and the same. The trial court did not err in concluding that the CRA contract was a property management agreement and not a lease agreement for purposes of MCL 559.212(1).

Moreover, even assuming that there were a lease component to the CRA contract, with Sanderson as the lessor and CRA as the lessee, we believe it would only encompass, at most, part of the contract. Stated otherwise and being generous to Sanderson, the CRA contract could be viewed as part lease and part property management agreement. The "lease" portion of the contract would include the provisions making the agreement operative for 15 years and mandating payments from CRA to Sanderson over the 15-year period. The aspects of the CRA contract requiring CRA "to assure an optimal supply of high quality, financially responsible recreational tenants," to use its "personnel, expertise and financial resources to undertake . . . leasing

-10-

responsibilities," and to market the property "in a manner intended to result in a reasonable number of rentals," all pertained to *property management relative to future leasing*. Accordingly, future leasing of the condominium unit by CRA to tenants would fall under the property management part of the CRA contract, again failing to implicate the exception in MCL 559.212(1) unless a lease had been signed in the short timeframe between execution of the 2015 CRA contract and the 2016 bylaw amendment. In sum, the trial court did not err in granting summary disposition in favor of HBLM on its complaint for declaratory and injunctive relief.

## D. DISCUSSION AND RESOLUTION – SUMMARY DISPOSITION AND SANDERSON'S COUNTERCLAIM AND THIRD-PARTY COMPLAINT

We begin with a discussion of the counterclaim and third-party claim of breach of contract. The breach of contract count related to the alleged 2008 amendment of the bylaws and the failure to file or record the amendment. With respect to the Board Members, we note there is no dispute that they were not on the board in 2008. Consequently, they could not have breached any contract or bylaw in 2008 relative to the purported amendment. See *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014) (a party alleging breach of contract must establish that there was a contract between the parties). Assuming that there was a contractual obligation in 2008 that was breached, we again note that the present-day Board Members cannot be held legally accountable for the presumed breach that did not occur during their board tenure. To the extent that Sanderson's third-party claims of negligence and breach of fiduciary duty against the Board Members were based on shortcomings or nonfeasance related to the alleged 2008 amendment, they fail for the same reason—the Board Members were not on the board in 2008.

With regard to the breach of contract counterclaim against HBLM, we must admit to some confusion. In the counterclaim, the breach of contract count referenced two statutory provisions, MCL 559.168 (requiring associations to keep copies of all amendments on file) and MCL 559.173 (requiring master deed amendments to be recorded), but the only *contractual* provision cited was Article I, § 7, of the bylaws. Once again, this bylaw provided that HBLM "shall maintain on file current copies of . . . any amendments" to the master deed "and shall permit all . . . prospective purchasers . . . in the Project[] to inspect the same during reasonable hours." Yet, much of the focus of the parties' arguments was on recordation, which is not covered by that particular bylaw. That said, Sanderson did additionally assert, and he renews the argument on appeal, that HBLM both failed to maintain in its files and have available for inspection a copy of the claimed 2008 amendment and to record the amendment.

There is no factual dispute that HBLM neither recorded nor maintained the proposed 2008 amendment in its files. HBLM's position is that the bylaw on rentals was not actually amended in 2008; therefore, there was no contractual or statutory obligation to record or file the claimed amendment.

MCL 559.153 provides that the amendment of a bylaw "shall be inoperative until recorded." On the basis of MCL 559.153, the alleged 2008 amendment never became operative because it was never recorded. Article I, § 7, of the bylaws required HBLM to maintain for inspection file copies of "any amendments," which we construe to mean any adopted or enforceable amendments, not attempted or proposed amendments. Absent recordation, there is no

valid, operative amendment. Accordingly, the breach of contract claim against HBLM premised on Article I, § 7, of the bylaws cannot survive.

Sanderson, however, argues that in 2008, an amendment prohibiting short-term rentals was actually fully approved; therefore, it should have been filed and recorded. He contends that had it been filed and recorded, he would never have purchased the property, as his plan in buying the unit was to construct a home and rent it to vacationers. As noted earlier, MCL 559.190(2) provides that a master deed or bylaw may be amended "with the consent of not less than 2/3 of the votes of the co-owners and mortgagees[,]" with a mortgagee having "1 vote for each mortgage held."[8] And MCL 559.173 provides that "[a] master deed and an *amendment* to the master deed *shall be recorded*." (Emphasis added.)[9] The question that arises is whether HBLM was obligated under these statutory provisions to record the alleged 2008 amendment, so as to have made it operative under MCL 559.153 and thereby require HBLM to have maintained the amendment in its files under Article I, § 7, of the bylaws. The answer hinges on whether, along with the approval of the HBLM co-owners, which is not in doubt, there was the requiste mortgagee approval.

The proposed 2008 amendment was referred to during a March 2012 board meeting. The minutes of that meeting provided in relevant part as follows:

> Considerable discussion took place about short term leasing restrictions. Several years ago an Amendment to the Master Deed was prepared which sought to restrict short term rentals. The amendment was never submitted to Macatawa Bank for approval (which was required because of their mortgage interest in the property). As such, the previous amendment is not valid.

Sanderson argues that the reference to the failure to obtain the mortgagee's approval constituted hearsay. Sanderson provides no legal citation or analysis regarding hearsay. He does direct our attention to a document labeled, "INTRODUCTION TO RENTAL DISCUSSION AND SURVEY QUESTIONS."[10] We shall refer to this document as the "survey letter." The survey letter was unsigned and provided in pertinent part:

> During the past year, there has been an increased interest in leasing units. Highfield's previous experience regarding rentals occurred back in 2008, with an extremely negative impact on the community. As a result, in 2008, the Co-Owners

---

[8] We note that "condominium documents may be amended without the consent of co-owners or mortgagees if the amendment does not materially alter or change the rights of a co-owner or mortgagee and if the condominium documents contain a reservation of the right to amend for that purpose to the developer or the association of co-owners." MCL 559.190(1). This provision was not applicable because the proposed 2008 amendment to end short-term rentals would have constituted a material alteration.

[9] Bylaws are "recorded as part of the master deed." MCL 559.153.

[10] The document contained the following opening sentence: "For those of you who were not able to attend the February 7, 2015 annual association meeting, a significant amount of time at the meeting was dedicated to discussing the issue of short term rentals."

voted and unanimously passed an Amendment to the Bylaws, increasing the minimum lease term from 14 days to a 90 day minimum lease term. This Amendment was never recorded with the County, however, and therefore may not be enforceable. As such, we assume that the original 14 day minimum lease term still applies.

Sanderson argues that because this passage from the survey letter did not allude to any failure to secure mortgagee approval, we can reasonably infer that mortgagee approval had been obtained. Sanderson also relies on his own deposition testimony wherein he claimed that three of the Board Members had informed him that the 2008 amendment had passed unanimously but that a "David Sachs or somebody failed to record it." When confronted with the March 2012 board meeting minutes indicating that the consent of mortgagee Macatawa Bank had not been procured, Sanderson testified that the three Board Members that he spoke to never "questioned Macatawa's role in that."

Board Member Barczyk executed an affidavit and averred that although he was not on the board in 2008, he did "know that the effort [to amend] ultimately failed, was not approved by the required mortgage holders and, accordingly, was not subject to recording and/or enforcement." Barczyk further averred:

> Also on information and belief (and by reference to minutes . . . dated 3/20/12), efforts to impose greater restrictions on rental activity were abandoned because Macatawa Bank had no interest in imposing additional restrictions on the units. Accordingly, the 2008 effort to impose greater restrictions failed.

We hold that Sanderson failed to create a genuine issue of material fact with respect to whether the amendment was actually approved and whether HBLM had an obligation to file or record the amendment. Sanderson had the burden to prove his breach of contract claim "by a preponderance of the evidence." *Miller-Davis Co*, 495 Mich at 178. In filing its motion for summary disposition under MCR 2.116(C)(10), HBLM was required to submit documentary evidence in support of the motion. MCR 2.116(G)(3)(b). HBLM submitted the board meeting minutes from March 2012 and Barczyk's affidavit, both of which indicated that mortgagee Macatawa Bank had not consented to or approved the proposed 2008 amendment.[11] In response, Sanderson was required to submit documentary evidence "showing that there is a genuine issue for trial." MCR 2.116(G)(4). The survey letter, assuming that it can even be considered despite the vagueness regarding its author and origin, was silent on the issue of whether mortgagee Macatawa Bank had given its approval. We do not find it reasonable to infer from the silence that Macatawa Bank had in fact consented to the 2008 amendment. Similarly, Sanderson's deposition

---

[11] Given Sanderson's inadequate briefing on the claim that the meeting minutes constituted hearsay, we deem the argument abandoned. See *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998) (an appellant cannot simply announce his position or assert error and leave it to us to unravel and elaborate for him his arguments, to discover and rationalize the basis for his claims, and to then search for authority to sustain his position). We do note that MRE 803(6) provides a hearsay exception for records of regularly conducted activity.

testimony did not suffice to create an issue of fact because Sanderson ultimately did not testify that the Board Members informed him that Macatawa Bank had approved the 2008 amendment. Sanderson's testimony that Board Members told him that the purported 2008 amendment was not recorded left open the possibility that it was not recorded because Macatawa Bank had not approved the amendment. Sanderson did not submit evidence sufficient to "show[] that there is a genuine issue for trial." MCR 2.116(G)(4).[12] In sum, the trial court did not err in granting the motion for summary disposition with respect to the counterclaim and third-party claim for breach of contract.

With regard to Sanderson's third-party claims of negligence and breach of fiduciary duty against the Board Members, we agree with the trial court that they fail as a matter of law. The factual bases of the claims were that the Board Members failed to educate themselves about the scope of the 2016 amendment, misled their fellow co-owners regarding the scope, benefits, limitations, and risks inherent in adopting the 2016 amendment, and neglected to ensure that the 2008 unrecorded amendment was recorded. Additionally, in regard to the fiduciary duty claim, Sanderson maintained that the Board Members failed to provide a meaningful opportunity for the co-owners to consider and debate the 2016 amendment.

"To establish a prima facie case of negligence, a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke*, 489 Mich at 162. A claim of breach of fiduciary duty "sounds in tort." *Miller v Magline*, *Inc*, 76 Mich App 284, 313; 256 NW2d 761 (1977). To establish a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages caused by the breach of duty. *Delphi Auto PLC v Absmeier*, 167 F Supp 3d 868, 884 (ED Mich, 2016).[13]

---

[12] Sanderson, citing MCL 559.173(1), presents a cursory argument that even if Macatawa Bank failed to approve the alleged 2008 amendment, that failure did not excuse HBLM from complying with "its mandatory duty to record an amendment approved by its membership, thereby providing record notice of its action." This argument lacks merit. Again, MCL 559.173(1) provides that "an amendment to the master deed shall be recorded." We construe this provision to require the recordation of an amendment that was actually fully approved in accordance with law, not attempted amendments. Without the approval or consent of the mortgagee, the proposed 2008 amendment failed, MCL 559.190(2), and thus MCL 559.173(1) did not require HBLM to record anything.

[13] "This Court has explained that a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Teadt v Lutheran Church Missouri Synod*, 237 Mich App 567, 580-581; 603 NW2d 816 (1999). A breach of fiduciary duty arises when a person holding a position of influence and confidence abuses the influence and betrays the confidence. *Id.* at 581. "A person in a fiduciary relation to another is under a duty to act for the benefit of the other with regard to matters within the scope of the relation." *Id.*

We initially reiterate that the Board Members here cannot be held liable for negligence or breach of fiduciary duty in connection with the failed 2008 amendment because they were not on the board in 2008.[14] Moreover, in light of our reasoning in rejecting the breach of contract claim associated with the failed 2008 amendment, we agree the Board Members would not be liable for failing to file or record the attempted amendment even had they been on the board in 2008.

Sanderson argues that Board Member Barczyk fit the statutory definition of "successor developer," MCL 559.235(1), because of the large number of lots that he owned; therefore, pursuant to Article VII, § 14, of the bylaws, his properties were not subject to the prohibition on short-term rentals found in the 2016 amendment. Sanderson further contends that there was a genuine issue of material fact regarding whether the Board Members actually relied on the advice and opinion of counsel concerning the Barczyk matter considering that there was evidence that the opinion of counsel was not communicated to the Board Members until after the 2016 amendment was approved. Sanderson next maintains that the trial court erred in dismissing the negligence and fiduciary duty claims because it was undisputed that the Board Members approved the 2016 amendment to bar short-term rentals on the basis of Barczyk's assurances that he would not engage in short-term rentals. Finally, Sanderson argues that the trial court erred in finding that no duties were owed to prospective purchasers under the Condominium Act. Specifically, Sanderson asserts, without citation to any particular legal authorities, that the Board Members had a duty to ensure that HBLM complied with its bylaws and Michigan law, to avoid misleading prospective purchasers who rely on recorded condominium documents, and "to not act cavalierly or mislead its members to secure fundamental and material changes to the bylaws."

We find it unnecessary to substantively resolve Sanderson's arguments that Barczyk's lots were not subject to the short-term rental prohibition, that there were issues of fact regarding whether a pre-vote legal opinion was procured, and that it was improper for Board Members to rely on Barczyk's assurances that he would not engage in the business of short-term rentals. At its core, Sanderson's position requires a determination that the Board Members had a duty—before the vote was taken on the 2016 amendment—to assess, correctly so, the purely legal question whether Barczyk would be bound by the amendment, to utilize the aid of counsel in the assessment, to ignore or not give any weight to Barczyk's assurances of future compliance, and to inform condominium co-owners of their legal conclusions. Sanderson has simply not provided us with any pertinent authorities or analysis to support the existence of these duties. Perhaps these various obligations or duties might arise under circumstances in which a bylaw was unlawfully amended, but the bylaw in the instant case could legally be amended to prohibit short-term rentals *even if the units owned by Barczyk were not subject to the restriction*. Furthermore, on the matter of causation, Sanderson engages in pure speculation by asserting that, assuming the inapplicability of the short-term rental prohibition to Barczyk's lots, the voting co-owners would have voted against the 2016 amendment. And as noted by the trial court, Sanderson failed to submit any evidence of a co-owner who felt misled.

---

[14] We reject any suggestion that all future board members were susceptible to liability for alleged failures that occurred during the tenure of past board members.

Additionally, while the Condominium Act defines the term "successor developer," MCL 559.235(1), it also separately defines the term "developer," MCL 559.106(2). And Article VII, § 14, of the bylaws, which is the provision Sanderson relies on in support of his Barczyk-related argument, refers solely to the "Developer." Given the distinction in the terms "successor developer" and "developer" under the Condominium Act, it would be reasonable to conclude that the terms should also be distinguished for purposes of the bylaws. We, however, choose not to answer the question whether the properties Barczyk owned were subject to the short-term rental restriction. But we do hold that this legal question is subject to reasonable dispute and debate such that we conclude as a matter of law that there was no negligence or breach of fiduciary duty on the part of the Board Members.[15] Moreover, we similarly conclude as a matter of law that relying on assurances by Barczyk that he would not engage in short-term renting did not constitute negligence or breach of fiduciary duty.

The remaining arguments posed by Sanderson ultimately relate to the failed 2008 amendment and do not warrant reversal for the reasons discussed earlier. To the extent that Sanderson is arguing, outside the filing and recording requirements of the bylaws and Condominium Act, that the Board Members had a duty to inform Sanderson that HBLM tried but failed to prohibit short-term rentals in 2008, we are not prepared to recognize such a duty, nor has Sanderson supplied us with any authority supporting that proposition. In sum, the trial court did not err in granting the motion for summary disposition with respect to the claims of negligence and breach of fiduciary duty.

## E. DISCUSSION AND RESOLUTION – ATTORNEY FEES AND COSTS

We unanimously conclude that the trial court did not err by awarding attorney fees and costs to HBLM. And we likewise all agree with respect to the analysis of the various arguments posed by Sanderson in challenging the award, except in regard to Sanderson's argument that the trial court erred because HBLM failed to plead a contract claim to enforce the bylaws in regard to the recovery of attorney fees and costs. In my view, the law required HBLM to plead a contract claim for attorney fees and costs. My two colleagues disagree with my position, concluding that it was unnecessary for HBLM to plead a contract claim because statutory authority supported the award. Despite our analytical disagreement, I do find that attorney fees and costs were nonetheless properly awarded because the complaint indicates that the allegations set forth by HBLM were sufficient to plead a contract claim for fees and costs.

"As a general rule, attorney fees are not recoverable as an element of costs or damages absent an express legal exception." *Fleet Business Credit v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584, 589; 735 NW2d 644 (2007). Attorney fees may be recovered if expressly provided for by contract. *Id.* Attorney fees are also recoverable if authorized by statute. *Dessart v Burak*, 470 Mich 37, 42; 678 NW2d 615 (2004).

---

[15] To be clear, in this part of the discussion we are operating under the assumption that a duty or duties existed. Furthermore, we are also assuming that the relationship between the Board Members and the co-owners actually constituted a fiduciary relationship, which is questionable.

MCL 559.206(b) provides as follows:

> In a proceeding arising because of an alleged default by a co-owner, the association of co-owners or the co-owner, if successful, shall recover the costs of the proceeding and reasonable attorney fees, as determined by the court, to the extent the condominium documents expressly so provide.

And Article XII, § 1(b), of the bylaws provided:

> In any proceeding arising because of an alleged default by any Co-Owner, the Association, if successful, shall recover the costs of the proceeding and reasonable attorney fees (not limited to statutory fees), as determined by the Court, but in no event shall any Co-Owner be entitled to recover such attorney fees.

Sanderson cites *Pransky v Falcon Group*, *Inc*, 311 Mich App 164; 874 NW2d 367 (2005), to support his argument that HBLM was required to plead a contract claim in order to recover attorney fees and costs under the applicable bylaw. *Pransky* involved a dispute over the validity of a consulting agreement. *Id*. at 167. After the defendant, Falcon Group, Inc., prevailed on its motion for summary disposition, Falcon Group moved for attorney fees and costs "as permitted under the consulting agreement." *Id*. at 172. The trial court granted the motion. *Id*. On appeal, this Court reversed the trial court's award of attorney fees, holding that "the party seeking the award of attorney fees as provided under the terms of an agreement must do so as part of a claim against the opposing party." *Id*. at 195. The *Pransky* panel explained:

> Falcon Group did not file a counterclaim for damages under the consulting agreement. Instead, it moved for an award of attorney fees and relied on the consulting agreement as authority for the award. *However, because the award of attorney fees was not authorized by statute or court rule, but was instead part of a contractual agreement, the trial court could only award the fees as damages on a claim brought under the contract.* By entering an order requiring [the plaintiff] to pay Falcon Group's attorney fees, the trial court in effect entered a judgment against [the plaintiff] on a claim that was never brought. A trial court may not enter judgment on a claim that was not brought in the original action in the guise of a postjudgment proceeding. [*Id*. (emphasis added).]

At first blush, *Pransky* appears distinguishable because in the instant case attorney fees and costs are authorized by statute, MCL 559.206(b), and by contract, Article XII, § 1(b), of the bylaws. I conclude, however, that on close scrutiny of the language in MCL 559.206(b), *Pransky* is not, in fact, distinguishable. MCL 559.206(b) allows for the recovery of attorney fees and costs, but only "to the extent the condominium documents expressly so provide." Thus, a more accurate characterization of MCL 559.206(b) is that it authorizes the inclusion of attorney fee and cost provisions in condominium documents, which can then be enforced. The statute, however, does not, *in and of itself*, serve as the basis to award attorney fees. For example, if a co-owner committed a default under the applicable condominium documents, but those documents did not include any language regarding an award of attorney fees and costs, the condominium association could not recover fees and costs in a successful lawsuit on the basis of the statute because the contractual documents did not expressly provide for such an award. Ultimately, and effectively, a claim for

-17-

attorney fees and costs is not a claim brought under MCL 559.206(b); rather, it is a claim brought under the contract, with the statute merely having provided the authority to have a fee and cost provision initially included in the condominium documents. Accordingly, when a condominium association seeks the recovery of attorney fees and costs in litigation over a default, it is necessarily presenting a contract claim, and it should be pleaded as such.

As indicated earlier, under the bylaw, HBLM can recover attorney fees and costs incurred in a proceeding if HBLM successfully establishes that there was a default by a condominium co-owner. Thus, pleading a contract claim would require allegations that the co-owner violated a bylaw or a provision in the master deed and that attorney fees and costs are recoverable under a fee-and-cost bylaw on successful completion of the litigation. HBLM's complaint, when viewed as a whole, contains such allegations, even though they are not specifically contained in a count identified or labeled as a contract claim. See *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 710-711; 742 NW2d 399 (2007) ("It is well settled that the gravamen of an action is determined by reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of the claim."). Accordingly, I conclude that HBLM adequately pleaded a contract claim for attorney fees and costs.

Respectfully, I do find it necessary to briefly respond to my colleagues who disagree with my conclusion that a condominium association must plead a contract claim in order to recover attorney fees and costs. First, to be clear, the premise of my position is that bylaws are in fact contracts or contractual in nature. *Conlin v Upton*, 313 Mich App 243, 255; 881 NW2d 511 (2015) ("When validly promulgated, an entity's bylaws or similar governing instrument will constitute a binding contractual agreement between the entity and its members."). Indeed, earlier in this opinion we indicated that "[c]ondominium bylaws are interpreted according to the rules governing the interpretation of a contract." *Tuscany Grove*, 311 Mich App at 393. Second, while *Pransky* did not involve a condominium, it applies to any case in which attorney fees are being sought under the terms of an agreement, which necessarily includes condominium bylaws. As explained above, MCL 559.206(b) does not entitle HBLM to attorney fees and costs; rather, it simply entitles HBLM to include an enforceable fee and cost provision in its condominium documents, the absence of which would result in no recovery. MCL 559.206(b) merely reflects a legislative blessing for condominium associations to contractually bind co-owners to pay for costs and attorney fees if a default is established in litigation. Finally, the cases cited in support of my colleagues' position are simply inapposite because they predate *Pransky* and did not address the issue confronting this panel.

Sanderson next argues that the trial court erred by including in its award the attorney fees incurred by HBLM in defending against Sanderson's counterclaim for breach of contract.[16] We disagree. Consistent with MCL 559.206(b), Article XII, § 1(b), of the bylaws provides that HBLM shall recover attorney fees and costs of any "proceeding" that "aris[es] because of an alleged default by any Co-Owner" if HBLM is successful in the proceeding. Giving the language of this unambiguous bylaw its plain and ordinary meaning, *Rory*, 473 Mich at 464, we hold that the bylaw

---

[16] It is my understanding that all members of this panel are in agreement with respect to the analysis of the remaining arguments and issues.

entitled HBLM to an award of attorney fees and costs associated with defending against Sanderson's counterclaim. The proceeding arose because of Sanderson's alleged default, which has now been established, and the counterclaim was part of and encompassed by the "proceeding."

Furthermore, assuming for the sake of argument that the counterclaim must be viewed as its own "proceeding" apart from the complaint for purposes of the bylaw, the counterclaim for breach of contract still constituted a proceeding arising because of an alleged default. Sanderson only filed the counterclaim because he was accused of a default for violating the amended bylaw restricting rentals—without the default there would have been no responsive counterclaim. Indeed, the breach of contract counterclaim sought money damages on the possibility that Sanderson would not be permitted to use his property for short-term rentals because of the amended bylaw.[17] Accordingly, the trial court did not err by awarding HBLM attorney fees and costs incurred in defending against the counterclaim.[18]

Finally, Sanderson argues that the trial court erred by reducing the amount of the award by only 10 percent absent any explanation with respect to how the court arrived at that particular percentage. The trial court made the 10 percent reduction on the basis that HBLM had improperly included attorney fees connected to representation of the Board Members in defense against Sanderson's third-party claims.

Article I § 7, of the bylaws provided, in relevant part, as follows:

> Every director and every officer of the corporation shall be indemnified by the corporation against all expenses and liabilities, including counsel fees, reasonably incurred by or imposed upon him in connection with any proceeding to which he may be a party, or in which he may become involved, by reason of his being or having been a director or officer when expenses are incurred, except in such cases wherein the director or officer is adjudged guilty of willful or wanton misconduct or gross negligence in the performance of his duties. . . .

The attorney fees and costs incurred by the Board Members related to their defense against Sanderson's third-party claims. Those claims arose because of HBLM's proceeding against Sanderson for the default. Because the Board Members' attorney fees and costs arose during this proceeding, HBLM was entitled to recover the indemnification amount as "costs of the proceeding" under MCL 559.206(b) and Article XII, § 1(b), of the bylaws. Even though we

---

[17] Contrary to HBLM's argument, the counterclaim was not in essence an affirmative defense. The breach of contract counterclaim would not have defeated HBLM's assertion that a default occurred. Rather, Sanderson's breach of contract theory was that the breach resulted in him having no notice that HBLM contemplated rental limitations as early as 2008, which, had he known this, would have led him to choose against purchasing the property in the first place.

[18] Sanderson's reliance on *Cohan v Riverside Park Place Condo Ass'n, Inc*, 123 Mich App 743; 333 NW2d 574 (1983), is misplaced because there the condominium co-owner filed suit against the condominium association and the co-owner's complaint did not arise because of a default. To the extent that *Cohan* could be construed differently, it is not binding precedent. MCR 7.215(J)(1).

conclude that HBLM was entitled to all of the fees and costs associated with defending the Board Members against Sanderson's third-party claims and that there should not have been a 10 percent reduction, reversal and remand is unwarranted because HBLM did not cross appeal the trial court's reduction decision.

We affirm. Having fully prevailed on appeal, defendants may tax costs under MCR 7.219.


/s/ Jane E. Markey